UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

RSM McGladrey, Inc.,

    Plaintiff,

    v.

Peter Epp, Gil Bernhard and Steven Schwartz,

    Defendants.

Civil No. 11-cv-612 (ADM-SER)

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

MICHAEL J. MINENKO, ESQ.
MINENKO & HOFF, P.A.
5200 Willson Road, Suite 150
Edina, Minnesota 55424
(952) 922-6766

WILLIAM S. GYVES, ESQ.*
EPSTEIN BECKER & GREEN, P.C.
250 Park Avenue
New York, New York 10177
(212) 351-4500

\*   Admitted pro hac vice

Attorneys for Defendants

FIRM:15647450v2

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................... iii

PRELIMINARY STATEMENT ....................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 3

    A.    The Parties .......................................................................................... 3

          1.  Plaintiff .................................................................................. 3

          2.  Defendants ............................................................................. 3

    B.    Nature of the Action ......................................................................... 4

    C.    Nature of the Defendants' Practice ................................................. 4

    D.    The Related Proceedings .................................................................. 5

ARGUMENT ...................................................................................................................... 6

    POINT I.

    EIGHTH CIRCUIT AUTHORITY PRECLUDES
    A PRELIMINARY INJUNCTION HERE ........................................................ 6

    POINT II.

    RSM McGLADREY HAS FAILED TO MAKE THE REQUISITE
    SHOWING THAT IT IS ENTITLED TO INJUNCTIVE RELIEF ..................... 11

    A.    The Controlling Legal Standard ..................................................... 11

    B.    The Demonstrable Absence of Irreparable Harm
        Is Fatal to the Application for Injunctive Relief ........................... 11

C.    Non-Parties Will Be Severely
      Impacted If Defendants Are Enjoined ........................................ 16

      1.    Miami Beach Community Health Center ........................ 17

      2.    Syracuse Community Health Center.............................. 20

D.    Injunctive Relief Would Upset
      Rather Than Preserve the Status Quo ........................................ 24

E.    RSM McGladrey Is Unable to Demonstrate a
      Likelihood of Success on the Merits........................................... 25

CONCLUSION ................................................................................................. 26

FIRM:15647450v2

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Alpine Glass, Inc. v. Adams,
    2002 WL 31819910 (Minn. App. Dec. 17, 2002) ..................... 25

Baker's Aid v. Hussmann Foodservice Co.,
    830 F.2d 13 (2d Cir. 1987) ................................................. 15

Bennett v. Storz Broad. Co.,
    134 N.W.2d 892 (Minn. 1965) .......................................... 25

Bromen Office 1, Inc. v. Coens,
    2004 WL 2984347 (Minn. App. Dec. 28, 2004) ..................... 14

CDI Energy Servs., Inc. v. West River Pumps, Inc.,
    567 F.3d 398 (8th Cir. 2009) ............................................ 17

Cenveo Corp. v. Southern Graphic Sys., Inc.,
    2009 WL 161210 (D. Minn. Jan. 22, 2009) .......................... 17

CHS, Inc. v. Petronet, LLC,
    2010 WL 4721073 (D. Minn. Nov. 15, 2010) ....................... 11

Clarus Med., LLC v. Myelotec, Inc.,
    2005 WL 2206125 (D. Minn. Sept. 9, 2005)........................... 9

Connors v. Shannopin Mining Co.,
    675 F. Supp. 986 (W.D. Pa. 1987)...................................... 17

Dataphase Sys., Inc. v. C.L. Sys., Inc.,
    640 F.2d 109 (8th Cir. 1981) (en banc) ............................ 9, 11

Eco Water Sys. LLC v. KRIS, Inc.,
    2007 WL 1321851 ............................................................ 9

Eutectic Welding Alloys Corp. v. West,
    160 N.W.2d 566 (Minn. 1968) .......................................... 25

Foster v. Realty Title Co.,
    680 P.2d 323 (Mont. 1984)............................................... 14

General Motors Corp. Fanning v. High Mountain Inspections, Inc.,
    520 F. Supp. 2d 55 (D.D.C. 2007)...................................... 17

iii

Harvey Barnett, Inc. v. Shidler,
    143 F. Supp. 2d 1247 (D. Colo. 2001) .......................................................... 14

Independent Asphalt Consultants, Inc. v. Studebaker,
    2010 WL 4278416 (Nev. Oct. 25, 2010) ...................................................... 14

International Bus. Mach. Corp. v. Visentin,
    2011 WL 672025 (S.D.N.Y. Feb. 16, 2011) ................................................ 15

Internet Inc. v. Tensar Polytechnologies, Inc.,
    2005 WL 2453170 (D. Minn. Oct. 3, 2005) ................................................ 11

Long Island Conservatory, Ltd. v. Jin,
    2007 WL 137114 (N.Y. Sup. Ct. Jan. 19, 2007) ......................................... 15

Manhattan Group, LLC v. Automoblox Company, LLC,
    2010 WL 5625960 ......................................................................................... 8

Manion v. Nagin,
    255 F.3d 535 (8th Cir. 2001) ................................................................... 7, 8

Merrill Lynch, Pierce, Fenner & Smith, Inc v. Hovey,
    726 F.2d 1286 (8th Cir. 1984) ...................................................................... 8

Nat'l Recruiters, Inc. v. Cashman,
    323 N.W. 2d 736 (1982) ............................................................................. 25

Peabody Coalsales Co. v. Tampa Electric Co.,
    36 F.3d 46 (8th Cir. 1994) ............................................................................ 8

Peshlakai v. Duncan,
    476 F. Supp. 1247 (D.D.C. 1979) ............................................................... 17

S&M Klein Co. v. Glass,
    2010 N.Y.Misc.Lexis 1425 (N.Y. Sup. Ct. Feb. 9, 2010) ........................... 14

SchlumbergerSema, Inc. v. Xcel Energy, Inc.,
    2002 WL 31628501 (D. Minn. Nov. 18, 2002) ....................................... 9, 10

Sutley v. Slechow,
    1996 WL 733 (Minn. App. Jan. 2, 1996) .............................................. 12, 13

Timm & Assoc., Inc. v. Broad,
    2005 WL 3241832 (D. Minn. Nov. 30, 2005) ...................................... 12, 14

FIRM:15647450v2

United Prod. Corp. of Am. Inc. v. Cederstrom,
    2006 WL 1529478 (Minn. App. June 6, 2006) ........................................................... 25

Village of Blaine v. Independent School Dist. No. 12 Anoka County,
    121 N.W.2d 183 (Minn. 1963) ................................................................................... 24

Watkins Inc. v. Lewis,
    346 F.3d 841 (8th Cir. 2003) ..................................................................................... 11

## PRELIMINARY STATEMENT

Defendants Peter Epp, Gil Bernhard, Steven Schwartz (collectively, "Defendants") respectfully submit this memorandum of law in opposition to plaintiff RSM McGladrey, Inc.'s ("RSM McGladrey") motion for a preliminary injunction.

Having improperly obtained an ex parte temporary restraining order in state court and depriving the Defendants of any opportunity to oppose that extraordinary relief, RSM McGladrey upon removal now asks this Court to continue that injunction in aid of the arbitration it has commenced pursuant to the parties' controlling employment agreements. Its application is defective on multiple grounds and, Defendants respectfully submit, should be denied.

As discussed below in Point I, the Eighth Circuit has made it clear that where, as here, an injunction application requires an assessment of the merits of any claim subject to arbitration, a court should deny the application out of deference to the arbitration process through which the parties are contractually bound to resolve their dispute. RSM McGladrey is well aware of this Eighth Circuit authority, which explains the desperation of its position on the remand motion also pending before the Court. No harm flows to RSM McGladrey if the Court denies this application. RSM McGladrey remains free to seek injunctive relief from the arbitrators, which is what it should have done in the first place rather than improperly sandbagging the Defendants with the ex parte state court temporary restraining order.

Even if the Court were inclined to entertain RSM McGladrey's application, injunctive relief is neither warranted nor appropriate here.  As demonstrated below in Point II:

- RSM McGladrey is unable to establish irreparable harm because the controlling employment agreement has a carefully crafted liquidated damages provision that affords RSM McGladrey an adequate - - indeed, quite generous - - remedy at law;

- the injunction RSM McGladrey seeks is contrary to the public interest in that it would significantly and unfairly impact large numbers of persons who are not parties to this case;

- the injunctive relief sought is wholly inappropriate because it would upset rather than preserve the status quo; and

- RSM McGladrey has not demonstrated a probability of success on the merits of its core assertion that Defendants have breached their restrictive covenants.

In light of the above, Defendants respectfully submit RSM McGladrey's application should be denied in its entirety.

FIRM:15647450v2

## STATEMENT OF FACTS

**A.**     **The Parties**

    **1.**     **Plaintiff**

RSM McGladrey is a national firm providing tax services.  See Affidavit of

Daniel A. Lipari ("Lipari Affidavit"), ¶ 3.  RSM McGladrey and its close affiliate,

McGladrey & Pullen, LLP ("M&P"), operate under an alternative practice structure.  See

Affidavit of Gil Bernhard ("Bernhard Affidavit"), ¶ 5.  Through this structure, M&P and

RSM McGladrey provide audit, tax and business consulting services.  Id.  Separately,

they could not provide all of these services to their clients.  Id.  (RSM McGladrey and

M&P are referred to collectively herein as "McGladrey.")

    **2.**     **Defendants**

Epp and Bernhard currently are employees in the Healthcare Services

Group of J.H. Cohn, LLP ("JH Cohn").  Schwartz is a partner in that group.  J.H. Cohn is

an accounting and consulting firm based in Roseland, New Jersey.  Defendants, all New

York residents, work out of J.H. Cohn's Manhattan office.  See Bernhard Affidavit, ¶ 2;

Affidavit of Peter Epp ("Epp Affidavit"), ¶ 2; Affidavit of Steven Schwartz ("Schwartz

Affidavit"), ¶ 2.

Prior to joining J.H. Cohn in February 2011, Defendants were affiliated

with both M&P and RSM McGladrey.  See Epp Affidavit, ¶ 3; Bernhard Affidavit, ¶ 3;

Schwartz Affidavit, ¶ 3.  As Managing Directors of RSM McGladrey, Defendants'

relationships with that firm were governed by its standard Managing Director

Employment Agreement ("Employment Agreement").   A copy of the Employment

3

Agreement is attached as Exhibit B to the affidavits each Defendant has submitted in opposition to RSM McGladrey's application.

On January 4, 2011, RSM McGladrey fired Schwartz. Epp and Bernhard were terminated effective January 17, 2011. See Epp Affidavit, ¶¶ 4, 23; Bernhard Affidavit, ¶¶ 4, 24; Schwartz Affidavit, ¶¶ 4, 15.

**B.      Nature of the Action**

RSM McGladrey commenced this action on March 7, 2011 by way of an <u>ex parte</u> application for temporary restraints. In its one-count Complaint, RSM McGladrey sought a temporary injunction against Defendants. RSM McGladrey asserts no substantive claims, as those claims are subject to the mandatory arbitration provision set forth in Section 8.5 of the Employment Agreement. In the arbitration, RSM McGladrey asserts claims for breach of contract, tortious interference with business relationships, attorneys' fees and a permanent injunction. See Declaration of William S. Gyves, Esq. in Opposition to Preliminary Injunction ("Gyves Declaration"), ¶ 12, Ex. A, at 7.

**C.      Nature of the Defendants' Practice**

The Defendants are Certified Public Accountants. Their practices focus exclusively on the healthcare sector. Defendants' specialty is providing audit and consulting services to federally qualified health centers ("FQHC"). FQHCs are community-based organizations that provide healthcare services to underserved communities. These centers are funded through various federal and state government programs. The laws and regulations relating to the financing and operation of these FQHCs are extremely complex. They are subject to strict reporting deadlines requiring

4

the health centers to submit to the various funding agencies audited financial statements and other highly technical documents.

On the audit side of their practice, Defendants audit the financial statements of their healthcare clients, who in turn routinely submit those financials to banks and governmental entities to secure the funding needed to operate their not-for-profit community health centers. The group's consulting practice focuses on assisting clients in fulfilling their reporting requirements under applicable laws and regulations. See Epp Affidavit, ¶¶ 11-17; Bernhard Affidavit, ¶¶ 11-14; Schwartz Affidavit, ¶¶ 11-14.

**D.    The Related Proceedings**

This action is one of three litigations and two arbitrations McGladrey has commenced against these Defendants and/or J.H. Cohn, their new employer. On February 25, 2011, McGladrey commenced the first in this series of legal proceedings. On that date, it filed suit in New York State Supreme Court seeking a temporary restraining order against Defendants and J.H. Cohn. On February 28, 2011, the New York court denied the application for temporary restraints. On March 4, 2011, McGladrey dismissed Defendants from the New York action, which is still pending regarding J.H. Cohn.

A hearing on McGladrey's application for a preliminary injunction against J.H. Cohn had been scheduled for March 18, 2011. On March 16, however, McGladrey sought and secured J.H. Cohn's consent to a three week adjournment. The preliminary injunction hearing is now scheduled to proceed on April 8, 2011. See Gyves Declaration, ¶¶ 4-8.

On March 7, 2011, M&P commenced an action in Missouri state court against the Defendants, scheduling <u>ex parte</u> a preliminary injunction hearing for the following week. On March 11, 2011, M&P obtained a preliminary injunction in the Missouri state action. Defendants are challenging that injunction. <u>Id.</u>, ¶¶ 8-9.

On March 8, 2011, RSM McGladrey and M&P commenced separate arbitrations against the Defendants pursuant to the terms of the controlling agreements. <u>Id.</u>, ¶¶ 11-12.

## ARGUMENT

### POINT I.

### EIGHTH CIRCUIT AUTHORITY PRECLUDES A PRELIMINARY INJUNCTION HERE

This is <u>not</u> a routine application for injunctive relief. RSM McGladrey has commenced an arbitration against the Defendants before the American Arbitration Association ("AAA"). <u>Id.</u>, ¶ 12, Ex. A. The arbitrable nature of this dispute is precisely what removes RSM McGladrey's application from the customary four-part injunctive relief analysis.

The Eighth Circuit repeatedly has instructed that, in the context of an arbitrable dispute, a court may not grant injunctive relief unless the controlling agreement expressly provides that a court can enjoin a party without addressing the merits of the underlying claims. There plainly is no such language in the Employment Agreement. <u>See</u> Employment Agreements at Section 8.5. To the contrary, to determine if injunctive relief is warranted here, the Court necessarily will have to weigh RSM McGladrey's

likelihood of success on the merits of the underlying claims that are the subject of the AAA arbitration. Indeed, RSM McGladrey in its brief argues at considerable length the merits of its claims. See Plaintiff's Memorandum of Law in Support of Its Motion for Preliminary Injunction at 11-17. The Defendants below at pages 25-26 challenge those purported merits. The Eighth Circuit has instructed courts confronted with an injunctive relief application in this context to exercise extreme caution so as not to become "impermissibly entangled" in the merits of the underlying claims because such a merits-based assessment is a task the parties have contractually assigned to the arbitrators rather than the court.

For example, in Manion v. Nagin, 255 F.3d 535 (8th Cir. 2001), the Eighth Circuit affirmed this Court's denial of injunctive relief in the context of an arbitrable dispute. Significantly, it did so despite a provision in the controlling agreement permitting a party to request injunctive relief from the courts in addition to pursuing arbitration. The Eighth Circuit instructed that in an arbitrable dispute, a court should not grant injunctive relief unless there is "qualifying contractual language" which permits it to do so. Id. at 539. To constitute the requisite qualifying contractual language, the court instructed, the controlling agreement must expressly "'provide[] the court with clear grounds to grant relief without addressing the merits of the underlying arbitrable dispute.'" Id. Addressing a contractual clause providing that in the event of a breach the injured party could seek injunctive relief from the court, the Manion court found such a provision to fall short of the mark because "in order to issue such relief the district court

would have been required to determine that a breach had occurred and to have made a determination on the merits of the underlying dispute, an issue for the arbitrator." Id.

The controlling principle articulated in Manion is also at the core of the Eighth Circuit's decisions in Peabody Coalsales Co. v. Tampa Electric Co., 36 F.3d 46 (8th Cir. 1994), and Merrill Lynch, Pierce, Fenner & Smith, Inc v. Hovey, 726 F.2d 1286 (8th Cir. 1984). All three Eighth Circuit decisions on this point reflect the indisputable logic that the "judicial inquiry requisite to determine the propriety of injunctive relief necessarily would inject the court into the merits of issues more appropriately left to the arbitrator." See Peabody Coalsales, 36 F.3d at 47 (quoting Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395 (1967)). This restrained approach is consistent with the long-standing tenet under the Federal Arbitration Act ("FAA") that where the parties have agreed to arbitrate, the "courts are asked to stay their hand." Hovey, 726 F.2d at 1289; see also Peabody Coalsales, 36 F.3d at 47 (role of the courts in disputes governed by the FAA "is a very limited one").

In light of these precedents, the judges of this Court routinely deny injunctive relief under precisely the circumstances presented here. See, e.g., Manhattan Group, LLC v. Automoblox Company, LLC, 2010 WL 5625960, at **4-5 (D. Minn. Dec. 30, 2010) (denying preliminary injunction motion, court noted that "pendency of an arbitration to resolve the merits of the parties' dispute requires us to change" the traditional four-part approach to such applications and observed "courts must be particularly cautious in granting preliminary injunctive relief when the parties have contracted to resolve their dispute in arbitration"); Eco Water Sys. LLC v. KRIS, Inc.,

2007 WL 1321851, at **1, 5 (D. Minn. May 4, 2007) (adopting report and recommendation of magistrate judge who found that a contractual right to petition a court for injunctive relief in connection with an arbitration did not constitute the requisite qualifying contractual language because a court still would be required to "conduct an inquiry under the four factors test set forth in Dataphase in order to determine whether injunctive relief is warranted, including likelihood of success on the merits"); Clarus Med., LLC v. Myelotec, Inc., 2005 WL 2206125, at *3 (D. Minn. Sept. 9, 2005) (contractual provision permitting party to seek injunctive relief from a court in connection with an arbitration was "insufficient to allow the Court authority to consider [the] request for injunctive relief" because that clause did not "allow the Court to grant relief without the Court addressing the merits of the underlying dispute"); SchlumbergerSema, Inc. v. Xcel Energy, Inc., 2002 WL 31628501, at *2 (D. Minn. Nov. 18, 2002) (denying injunctive relief in this context because "[o]nly contractual language that 'provides the court with clear grounds to grant relief without addressing the merits of the underlying arbitrable dispute' may serve as the basis for injunctive relief").

The Eco Water Systems court recognized that it could not order injunctive relief without "entangling itself in the merits of the claims," which were "arbitrable issues[.]" Eco Water Systems, 2007 WL 1321851, at *5. Any such judicial inquiry, the court noted, "would be incompatible with the parties' arbitration agreement[.]" Id. Similarly, the SchlumbergerSema court reasoned that it could not rule on a request for injunctive relief there without "entangling it[self] in issues that should be addressed to the arbitrator." SchlumbergerSema, 2002 WL 31628501, at *2.

9

Here, the arbitration provision in the Employment Agreement permitting RSM McGladrey to seek injunctive relief pending the outcome of the arbitration it has commenced is insufficient as a matter of law to constitute "qualifying contractual language." See Employment Agreement, Section 8.5. The arbitration clause does not purport to require the Court to enjoin Defendants here. Further, the arbitration clause does not authorize this Court to grant injunctive relief without first assessing the merits of RSM's underlying claims. To the contrary, as RSM makes clear in its brief, an assessment of the merits of RSM's claims is an integral part of the analysis this Court otherwise would be bound to conduct in determining whether injunctive relief is warranted here.

In sum, because (1) the parties' dispute is subject to a broad arbitration provision that RSM McGladrey already has invoked by commencing arbitration, and (2) the Employment Agreement provides nothing even remotely approaching the "qualifying contractual language" required under controlling Eighth Circuit precedent, Defendants respectfully submit that as a matter of law there is no basis to grant injunctive relief here. If injunctive relief is what RSM McGladrey seeks, it must pursue that relief as part of the AAA proceeding it already has commenced.

## POINT II.

## RSM McGLADREY HAS FAILED TO MAKE THE REQUISITE SHOWING THAT IT IS ENTITLED TO INJUNCTIVE RELIEF

### A.    The Controlling Legal Standard

Even if the Court determines that it can properly consider RSM McGladrey's application, well settled legal principles compel its denial. An injunction is an extraordinary and harsh remedy not to be granted lightly. Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc). To obtain that extraordinary relief here, RSM McGladrey must demonstrate (1) a threat of irreparable harm; (2) a balancing of hardships weighs in its favor granting the requested relief; (3) a probability of success on the merits; and (4) the public interest favors granting the relief. Id.

### B.    The Demonstrable Absence of Irreparable Harm Is Fatal to the Application for Injunctive Relief

RSM McGladrey cannot satisfy the irreparable harm prong of this test. It is well-settled that "[f]ailure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003); Internet Inc. v. Tensar Polytechnologies, Inc., 2005 WL 2453170, at *4 (D. Minn. Oct. 3, 2005). Indeed, "lack of irreparable injury is the factor that should begin and end . . . the analysis." CHS, Inc. v. Petronet, LLC, 2010 WL 4721073, at *3 (D. Minn. Nov. 15, 2010).

Irreparable harm is a harm for which there is no adequate remedy at law. Watkins, 346 F.3d at 844. A party does not suffer irreparable harm if a monetary award will provide an adequate remedy for the allegedly improper conduct of which it

11

complains. <u>Timm & Assoc., Inc. v. Broad</u>, 2005 WL 3241832, at *3 (D. Minn. Nov. 30, 2005).

Here, the Employment Agreement at Section 5.2 includes an extraordinarily detailed liquidated damages formula. This formula was intended to provide and does provide RSM McGladrey with an ability to calculate its alleged damages in the event of precisely the kind of wrongful conduct it attributes to the Defendants. Liquidated damages -- <u>by definition</u> -- constitute an adequate remedy at law. They signify "the damages the amount of which the parties to a contract stipulate and agree, when the contract is entered into, shall be paid in case of breach." <u>Sutley v. Slechow</u>, 1996 WL 733, at *3 (Minn. App. Jan. 2, 1996).

The liquidated damages clause in the Employment Agreement reflects this principle. There, RSM McGladrey required each Managing Director, including the Defendants, to agree as follows:

> Managing Director also acknowledges that in the event he should breach any of the covenants contained in this Article 5, any assessment of the damages suffered by RSM McGladrey would be difficult to quantify and would, therefore, likely be inadequate to compensate RSM McGladrey's losses. Therefore, Managing Director hereby <u>agrees that the liquidated damages calculated herein are fair and reasonable estimates of RSM McGladrey's damages in the event of his breach</u> and therefore agrees to be bound by such calculations of his liability for liquidated damages in the event that he breaches such covenants.

<u>See</u> Employment Agreement, § 5.2 (emphasis supplied).

This liquidated damages provision is no throw-away piece of boilerplate. It was carefully crafted by RSM McGladrey to afford itself a meaningful remedy in the event one of its Managing Directors breached the restrictive covenants in the Employment Agreement. Pegged to the detailed definitions of "Protected Client" and "Net Services" in Sections 5.2(a)(ii) and 5.2(a)(i)(aa), the liquidated damages clause provides:

> Managing Director shall pay to RSM McGladrey as liquidated damages and not as a penalty an amount equal to one hundred fifty percent (150%), without interest, of the dollar amount of Net Services (as hereafter defined) performed by RSM McGladrey or its Predecessors for such Protected Client during the twelve (12) month period ending on the last date RSM McGladrey, its subsidiaries or the Predecessor performed services for such Protected Client.

Id., § 5.2(a)(i).

Significantly, the scope of this provision is not limited with respect to the number of breaches a partner might commit, the nature of the breaching conduct or the type of harm flowing from those breaches. RSM McGladrey set no restrictions on the remedy it crafted for itself; instead, RSM McGladrey by its own calculation concluded that this 1.5 x revenue formula would adequately compensate it for any breaching conduct regardless of its magnitude or nature.

Having fixed that generous formula for itself and imposed it on Defendants, RSM McGladrey should not now be permitted to walk away from it. In the arbitration it has commenced against the Defendants, RSM seeks to recover precisely those damages

13

provided for in Section 5.2 of the Employment Agreement. See Statement of Claim, attached as Exhibit A to the Gyves Declaration, at 7. Inasmuch as this carefully constructed liquidated damages clause affords RSM McGladrey a legal remedy of its design, injunctive relief is neither warranted nor appropriate. The courts consistently have so held. See Timm & Assoc., 2005 WL 3241832, at *3, n.1 (noting the persuasiveness of argument that irreparable harm cannot exist because the employment agreement contains a liquidated damages provision); Bromen Office 1, Inc. v. Coens, 2004 WL 2984347, at *2 (Minn. App. Dec. 28, 2004) (finding no irreparable harm and noting that the relevant employment contracts contain liquidated damages clauses which would compensate plaintiff for economic loss); Harvey Barnett, Inc. v. Shidler, 143 F. Supp. 2d 1247, 1255 (D. Colo. 2001) (noting that any loss "is not `irreparable'" because in the controlling liquidated damages clause the allegedly injured party "chose the amount that it felt would compensate its loss"); Foster v. Realty Title Co., 680 P.2d 323, 326-27 (Mont. 1984) (controlling agreement "provides an agreed-upon remedy for breach" which "was an adequate remedy" and thus restraining order was denied); Independent Asphalt Consultants, Inc. v. Studebaker, 2010 WL 4278416, at *3 (Nev. Oct. 25, 2010) ("respondents will not cause irreparable harm . . . that damages cannot compensate . . . because the purchase agreement states that $85,000 in liquidated damages will compensate [plaintiff] for a breach of the covenant not to compete"); S&M Klein Co. v. Glass, 2010 N.Y.Misc.Lexis 1425, at *16 (N.Y. Sup. Ct. Feb. 9, 2010) (court denied preliminary injunction against former employee's continued servicing of employer's clients, where the non-compete agreement "provides a formula for

14

[defendant] to compensate [plaintiff] for clients he obtained" and thus plaintiff "has not demonstrated that it will suffer irreparable harm without injunctive relief"); Long Island Conservatory, Ltd. v. Jin, 2007 WL 137114, at *3 (N.Y. Sup. Ct. Jan. 19, 2007) (since plaintiff "included a liquidated damages provision in the restrictive covenant it drafted, it can be fully compensated by an award of money damages in accordance with the liquidated damages clause").

Aware that the liquidated damages clause it drafted is fatal to its ability to demonstrate irreparable harm, RSM McGladrey maintains that the Defendants have contractually waived any requirement that it demonstrate irreparable harm here. See Memorandum of Law in Support of Motion for Preliminary Injunction at 18 n.5. While convenient enough for RSM McGladrey, this argument is nonsense. RSM offers no authority for the proposition that, through the Employment Agreements, it could contractually excuse itself from having to satisfy the irreparable harm requirement before securing the extraordinary relief of a preliminary injunction. Indeed, the courts consistently have held to the contrary. They hold that the courts' role as gatekeepers with respect to injunctive relief cannot be contractually usurped. See, e.g., Baker's Aid v. Hussmann Foodservice Co., 830 F.2d 13, 16 (2d Cir. 1987) ("contractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary injunctive relief is appropriate"); International Bus. Mach. Corp. v. Visentin, 2011 WL 672025, at *7 n.4 (S.D.N.Y. Feb. 16, 2011) (noting that "parties to a contract cannot, by including certain language in that contract, create a right to injunctive relief where it would otherwise be inappropriate," court observes "[i]ndeed,

15

a contract provision does not, as a matter of law, constitute conclusive evidence that irreparable harm has occurred"). In short, whether irreparable harm has been demonstrated is for this Court to determine -- not RSM McGladrey.

### C. Non-Parties Will Be Severely Impacted If Defendants Are Enjoined

The clients RSM McGladrey would have this Court render off limits to Defendants are community-based not-for-profit organizations providing critical healthcare services to underserviced communities across the country. These health centers provide underserviced communities with primary care, dental and mental health services and a full menu of other services to populations who otherwise would have no access to healthcare. They are heavily dependent on governmental funding sources. These sources require audited financials and extensive financial reporting as a condition to the funding they provide.

As Epp, Bernhart and Schwartz demonstrate in their affidavits, if they are unable to work on a number of time-sensitive projects for these clients, the health centers are at risk of missing approaching regulatory reporting deadlines and, as a result, could experience potentially catastrophic losses or reductions in their funding. See Epp Affidavit, ¶¶ 30-34; Bernhard Affidavit, ¶¶ 28-33; Schwartz Affidavit ¶¶ 24-28. Given the Defendants' highly specialized practices and the nature of their clients, RSM McGladrey's application raises an unusually significant likelihood of harm to non-parties if the injunctive relief is granted. The impact an injunction may have on the public interest is a legitimate factor in disposing of applications for such extraordinary relief.

16

See, e.g., CDI Energy Servs., Inc. v. West River Pumps, Inc., 567 F.3d 398, 404 (8th Cir.

2009) (denying preliminary injunction seeking to enforce non-compete in employment

agreement because "the public's access to services [is] a more pressing policy concern

than the details of the relationship between a particular employee and employer").[1]

### 1.     Miami Beach Community Health Center

The Miami Beach Community Health Center ("MBCHC"), in Miami

Beach, Florida, is one client that stands to be directly impacted by any injunction here.

MDCHC services approximately 25,000 residents in the Miami-Dade County area who

otherwise would go without required healthcare. In her affidavit opposing RSM

McGladrey's application, Kathryn Abbate, MBCHC's Chief Executive Officer, states

that any interruption in the Defendants' ability to service her community health center

---

[1]  Cenveo Corp. v. Southern Graphic Sys., Inc., 2009 WL 161210, at *4 (D. Minn. Jan. 22, 2009) (denying preliminary injunction seeking to restrict business relationship with current and former clients of plaintiff based, in part, on the potential adverse effect on third parties); General Motors Corp. Fanning v. High Mountain Inspections, Inc., 520 F. Supp. 2d 55, 60 (D.D.C. 2007) (denying preliminary injunction to compel payment of pension and benefit fund contributions by defendant employer because "the public interest would not best be served by forcing [defendant] into liquidation *before* a determination has been made on the merits"); Connors v. Shannopin Mining Co., 675 F. Supp. 986, 990-91 (W.D. Pa. 1987) (denying preliminary injunction to compel defendant to bring its pension and benefits trusts current, where such an injunction "could substantially harm the public interest, by forcing [defendant] into insolvency and eliminating the jobs of the ultimate beneficiaries" of the trusts); Peshlakai v. Duncan, 476 F. Supp. 1247, 1261 (D.D.C. 1979) (denying preliminary injunction to halt project to test feasibility of uranium leaching, where advancement of technique promised greatly increased employment among Navajo population and it was "doubtful that the social or economic interests of the people on the ground, or the public interest, would be served by a halt of this technology").

17

could have a "devastating impact" on its ability to provide much needed healthcare.  <u>See</u> Affidavit of Kathryn Abbate ("Abbate Affidavit"), ¶¶ 3-4, 9.

MBCHC is a not-for-profit comprehensive healthcare network serving the poor, uninsured, underinsured and indigent population in the Miami-Dade County area. It provides family medicine, pediatric, obstetric and gynecology, internal medicine, dental, geriatric and behavioral health services to this underserved community.  Annually it provides these services to approximately 25,000 residents who otherwise would go without adequate health care.  <u>Id.</u>, ¶¶ 3-4.

As Abbate explains, for years Schwartz audited MBCHC's financial statements and assisted it in ensuring that its regulatory reporting was in compliance with the complex web of laws, rules and regulations governing this industry.  Given the nature of their operations and funding sources, FQHCs like MBCHC are subject to a complex set of rules, regulations and reporting requirements.  Schwartz has counseled MBCHC on the extensive regulatory reporting it is required to make in order to secure and maintain its governmental funding.  He also has audited the financial statements MBCHC submits to banks, governmental agencies and other entities upon whose funds it relies in providing services to its community.  <u>Id.</u>, ¶¶ 6, 10.

Among other things, because MBCHC receives Medicare funding, it must submit its "cost reports" to Medicare by May 31, 2011.  These highly detailed cost reports reflect MBCHC's expenses for the previous year.  They provide the basis for the per visit fee paid to MBCHC by Medicare for healthcare services rendered to its

18

Medicare patients.  These per visit fees paid by Medicare are the lifeblood of MBCHC and other operations like it.  Id., ¶ 11.

Significantly, these reports must include MBCHC's audited financials.  As a result, the actual audit must be completed well in advance of any cost report submission.  Timely completion of Schwartz's audit work for MBCHC is critical to its operations.  If MBCHC's cost reports are not submitted in a timely manner, Medicare will withhold its payments.  In fact, if MBCHC fails to file a timely cost report, all interim payments Medicare made to MBCHC since its previous annual report can be deemed overpayments.  As overpayments, Medicare can then seek a refund of all those payments in addition to withholding future payments.  Id., ¶¶ 12-13.

Any disruption in Medicare payments would have an immediate and profound impact on MBCHC's cash flow and, according to Abbate, any such disruption in MBCHC's cash flow would have a direct impact on its ability to continue to service its community.  Id., ¶ 14.

MBCHC also has a June 30, 2011 deadline looming.  The Children's Trust of Miami-Dade County funnels approximately $400,000 annually into MBCHC for a program called "Healthy Steps for Young Children."  This program focuses on well child visits, immunizations and parenting skills.  The Children's Trust requires MBCHC to submit audited financials by June 30.  If it does not do so, MBCHC runs the very real risk of losing this critical funding or at least seeing it diminished significantly.  Id., ¶ 15.

If MBCHC's audit is not completed, Abbate states, it almost certainly will miss its reporting deadlines.  It could be forced to identify and retain a Certified Public

19

Accountant with Schwartz's expertise in this arcane area. This auditor would need to get up to speed and then complete the work. Based on her 25 years of experience in the healthcare industry, Abbate does not think as a practical matter that it will be possible for MBCHC to overcome such a disruption and meet its reporting deadline. Id., ¶ 16.

### 2.   Syracuse Community Health Center

Dr. Ruben Cowart, Chief Executive Officer of Syracuse Community Health Center Companies, Inc. ("SCHC Companies"), a community-based healthcare network based in Syracuse, New York, echoes Abbate's position in the affidavit he has submitted in opposition to RSM McGladrey's application for injunctive relief. According to Cowart, any injunction preventing Defendants from servicing his operation "would severely threaten the SCHC Companies' ability to service its community." See Affidavit of Dr. Ruben P. Cowart ("Cowart Affidavit"), ¶¶ 3-6, 16.

SCHC Companies is a community-based health care network. It provides healthcare to medically underserved populations in the Syracuse area through a community health center, a Medicaid managed care plan and a foundation. SCHC Companies operates Syracuse Community Health Center, Inc. ("Syracuse Community Health Center"), the source of primary healthcare for approximately 80,000 low-income individuals each year. It provides these services through fifteen healthcare delivery sites and a network of approximately 1,500 providers. Id., ¶¶ 3-4.

SCHC Companies also operates Total Care, Inc. ("Total Care"), a not-for-profit managed care plan with approximately 43,000 members. Total Care provides a comprehensive health benefits package to enrolled members of the Medicaid program,

20

including a special program for free or low-cost insurance for children who are not eligible for Medicaid. Id. ¶ 6.

The Defendants historically provided auditing and consulting services to SCHC Companies. In or about January 2011, Cowart learned that Epp was leaving McGladrey but had not yet determined what new firm he would be joining. On January 31, 2011, Cowart contacted McGladrey to discuss the time sensitive nature of the matters Epp and his team were handling for SCHC Companies. During this telephone call, McGladrey acknowledged the time constraints SCHC was operating under with respect to these matters. It agreed to help facilitate the transition of those matters to whatever firm Epp selected as his new professional home. Id., ¶¶ 7-10.

In a letter dated February 3, 2011 and addressed to McGladrey, Cowart memorialized the substance of that discussion. Id., Ex. A. There, Cowart emphasized that Total Care and Syracuse Community Health Center "are in the middle of several complex and time sensitive issues (many of the issues were discussed in detail)." Cowart further noted that because of these time pressures "it is preferable for SCHC to have its 2010 audit performed by the previous audit team" -- i.e., Epp and his team. The letter also noted McGladrey's agreement to "maximize efforts to support SCHC working with Mr. Peter Epp and Mr. Steve Schwartz." Id.

Given the nature of its operations and funding sources, SCHC Companies is subject to a complex set of rules, regulations and reporting requirements. Defendants historically have advised Cowart on the extensive regulatory reporting SCHC Companies is required to make in order to secure and maintain its governmental funding. Defendants

21

also have audited the financial statements this client submits to banks, governmental agencies and other entities upon whose funds it relies in providing services to its community. Id., ¶ 17.

Among other things, because it receives Medicare funding, SCHC Companies must submit its "cost report" to Medicare by May 31, 2011. This highly detailed cost report reflects SCHC's expenses for the previous year. It provides the basis for the per visit fee paid to SCHC Companies by Medicare for healthcare services rendered to the center's Medicare patients. These per visit fees paid by Medicare are crucial to SCHC Companies. Significantly, this cost report must include SCHC's audited financials. As a result, the actual audit must be completed well in advance of any cost report submission. Id., ¶¶ 18-19.

According to Cowart, timely completion of SCHC Companies' audit work is critical to its operations. If SCHC Companies' cost report is not submitted in a timely manner, Medicare will withhold its payments. If SCHC fails to file a timely cost report, all interim payments Medicare made to it since its previous annual report can be deemed overpayments. Medicare is authorized to seek a refund of all those overpayments in addition to withholding future payments. If this occurred, it would be devastating to SCHC. Any disruption in Medicare payments would have an immediate and profound impact on SCHC Companies' cash flow. Any disruption in its cash flow would, in turn, have a direct impact on SCHC's ability to continue to service its community. Id., ¶¶ 20-21.

FIRM:15647450v2

For its part, Total Care is subject to reporting requirements of the New York State Department of Health ("NYSDOH"). Among other things, NYSDOH requires Total Care to file an annual audit report by April 1, 2011 covering the year ending December 31, 2010. In addition to its audited financials, Total Care must also submit a cost report to NYSDOH. Defendants until recently have been conducting the necessary audit work. If Total Care does not provide a substantially complete audit report by the April 1 deadline, New York's Commissioner of Health is authorized to levy a civil penalty. Id., ¶¶ 22-23. According to Cowart, if SCHC Companies is unable to get its audit completed promptly, SCHC Companies almost certainly will miss its reporting deadlines. Id., ¶ 24.

In light of the significant risk that the requested injunction could negatively impact literally thousands of indigent persons who rely on Defendants' clients for basic healthcare, it is respectfully submitted that granting such relief would be directly contrary to the public interest, highly inequitable and thus wholly unwarranted - - particularly when RSM McGladrey has an adequate remedy at law, as discussed above. As Abbate states:

> It is my understanding that this basically is a business dispute between RSM McGladrey and J.H. Cohn - - two large accounting and professional services firms. I ask that this Court not permit that dispute to affect the important work we at MBCHC are doing to provide healthcare to the underserved.

Abbate Affidavit, ¶17.

23

**D.**   **Injunctive Relief Would Upset**
        **Rather Than Preserve the Status Quo**

Injunctive relief is intended to maintain the status quo pending a full

hearing on the merits.  Village of Blaine v. Independent School Dist. No. 12, Anoka

County, 121 N.W.2d 183, 187 (Minn. 1963).  If granted, the relief RSM McGladrey

seeks here would have precisely the opposite effect.  The Defendants have been working

at J.H. Cohn since early February.  For over a month, they had been servicing long-

standing clients on time-sensitive matters involving audit and consulting work.  As

discussed above, these clients require the Defendants' professional services to remain in

compliance with certain financial and regulatory obligations critical to their ongoing

operations.

McGladrey has been aware of the Defendants' affiliation with J.H. Cohn

for at least a month.  Since at least January 31, 2011, McGladrey has known that the

Defendants' long-standing and loyal clients -- quite understandably -- intended to migrate

from McGladrey to some other firm in order to remain with their trusted advisors.  See

Lipari Affidavit, ¶ 9, Ex. A; Cowart Affidavit, ¶¶ 9-14, Ex. A.  It first sought injunctive

relief in this matter five weeks later.  To enjoin the Defendants at this late date from

continuing to serve those clients in question would upset the status quo.  Moreover, as

demonstrated above, any such disruption would have substantial negative consequences

both to these clients and the underserved communities to which they provide badly

needed health care.  Such a consequence to innocent third parties not before the Court

24

dictates that McGladrey's application for injunctive relief -- brought weeks after

McGladrey first learned of the conduct of which it now complains -- should be denied.

### E.   RSM McGladrey Is Unable to Demonstrate a <u>Likelihood of Success on the Merits</u>

RSM McGladrey has not established that it has a probability of success on

the merits of its core claim for breach of the restrictive covenants.  Under Minnesota law,

restrictive covenants are viewed with disfavor because they constitute agreements in

restraint of trade.  <u>See</u> <u>Nat'l Recruiters, Inc. v. Cashman</u>, 323 N.W. 2d 736, 740 (1982);

<u>Bennett v. Storz Broad. Co.</u>, 134 N.W.2d 892, 898 (Minn. 1965).  The test applied in

examining restrictive covenants is whether the restriction imposed on the employee is

greater than reasonably necessary to protect the employer's business, considering the

nature of the employment, the temporal restriction imposed, and the geographic scope of

the restriction.  <u>Id.</u> at 899.

The two-year temporal restriction RSM McGladrey seeks to impose upon

Defendants exceeds that which is reasonable or necessary to protect any purported

legitimate business interest it may have here.  Restrictions that are more expansive than

necessary to protect an employer's legitimate interests are generally held to be invalid.

<u>Id.</u> at 898.  Restraints of two years have been deemed unreasonable and unenforceable.

<u>See, e.g.</u>, <u>United Prod. Corp. of Am. Inc. v. Cederstrom</u>, 2006 WL 1529478, at **3-4

(Minn. App. June 6, 2006) (18 months unreasonable); <u>Alpine Glass, Inc. v. Adams</u>, 2002

WL 31819910, at *4 (Minn. App. Dec. 17, 2002) (one-year restriction rejected); <u>Eutectic</u>

25

<u>Welding Alloys Corp. v. West</u>, 160 N.W.2d 566, 570 (Minn. 1968) (two years unreasonable).

In light of the above, Defendants respectfully submit that RSM McGladrey has not established and cannot establish a probability of success on its core claim.

## CONCLUSION

For the reasons set forth above, defendants Peter Epp, Gil Bernhard and Steven Schwartz respectfully request that the Court deny the application for injunctive relief in its entirety.

Dated:  March 17, 2011

Respectfully submitted,

MINENKO & HOFF, P.A.

By: s/Michael J. Minenko
    Michael J. Minenko (#129872)
    5200 Willson Road, Suite 150
    Edina, Minnesota 55424
    (952) 922-6766
    mike@minenkohoff.com

Of Counsel:

EPSTEIN BECKER & GREEN, P.C.
William S. Gyves*
250 Park Avenue
New York, New York 10177
(212) 351-4500

*   Admitted <u>pro</u> <u>hac</u> <u>vice</u>

Attorneys for Defendants

26