**EXHIBIT B**

## MANAGING DIRECTOR EMPLOYMENT AGREEMENT
## CPA

**THIS MANAGING DIRECTOR EMPLOYMENT AGREEMENT** (the "Agreement") is effective as of _October 1_____, 200_8_, (the "Effective Date") by and between RSM McGladrey, Inc. and its assigns ("RSM McGladrey") and _Steven Schwartz_ ("Managing Director").

### RECITALS

**WHEREAS,** RSM McGladrey is a wholly owned, indirect subsidiary of H&R Block, Inc. ("Block") and RSM McGladrey is engaged in providing business services to the general public;

**WHEREAS,** Managing Director is or will be a partner of McGladrey & Pullen, LLP ("M&P"), a public accounting firm licensed and certified by the licensing authority in the state where Managing Director's office for performance of services for M&P is located;

**WHEREAS,** Managing Director desires employment with RSM McGladrey, and RSM McGladrey desires to employ Managing Director to provide business services to clients of RSM McGladrey; and

**WHEREAS,** RSM McGladrey and Managing Director desire to enter into this Agreement to set forth the terms and conditions of the employment relationship between Managing Director and RSM McGladrey.

### AGREEMENT

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants and agreements contained herein and other good and valuable consideration provided to Managing Director that may not be specifically referenced herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      **Employment**.  RSM McGladrey hereby employs Managing Director, and Managing Director hereby accepts and undertakes such employment, pursuant to the terms and conditions of this Agreement.

2.      **Term**.  This Agreement shall commence on the Effective Date. Thereafter, this Agreement may be terminated pursuant to the provisions of Article 7 hereof.  The term of this Agreement is hereafter referred to as the "Term."

3.      **Professional Responsibilities and Duties**.

3.1     Managing Director shall render such lawful services for RSM McGladrey and its customers or clients (the "Services") as are from time to time reasonably requested of Managing Director and assigned to Managing Director by RSM McGladrey.  RSM McGladrey and Managing Director intend that Managing Director

shall perform for RSM McGladrey only those Services which do not constitute the performance of any services for which a CPA certificate, permit and/or license (for either Managing Director or RSM McGladrey) are required by the laws of the applicable jurisdiction ("Public Accountancy"). In addition, RSM McGladrey and Managing Director intend that RSM McGladrey may contract with other companies to provide certified public accounting (including Managing Director, if Managing Director is a certified public accountant), on a contract basis, for the performance by such Managing Directors of Services on behalf of such other entity for the clients of such other entity. All fees for provision of the Services by Managing Director pursuant to this Agreement shall belong and be payable to RSM McGladrey. RSM McGladrey and Managing Director agree that the only services which Managing Director may provide for M&P shall be (i) Public Accountancy services and (ii) those services otherwise approved by RSM McGladrey. Managing Director shall, in addition to the duties described above:

        (a)    Keep or cause to be kept, appropriate records, reports, claims and correspondence necessary and appropriate in connection with the Services provided by Managing Director hereunder.

        (b)    Promote, to the extent permitted by applicable law and regulations, the business of RSM McGladrey.

        (c)    Perform all acts necessary to maintain all of Managing Director's skills at an appropriate level.

        (d)    Participate, at RSM McGladrey's request, in activities designed to enhance and develop the national accounting practice of RSM McGladrey and its affiliates.

        (e)    Comply with any by-laws, policies, practices, procedures or rules of RSM McGladrey.

        (f)    Promptly furnish to RSM McGladrey all relevant information requested by RSM McGladrey related directly or indirectly to Managing Director's performance of Services.

    3.2.   **Performance in Good Faith**. Managing Director shall devote such of his productive time, attention, and energies to RSM McGladrey's business, to the best of Managing Director's abilities, competently, with diligence, in good faith and with integrity, as is required for performance of his duties set forth under Section 3.1 above; provided, however, RSM McGladrey acknowledges and agrees that (a) Managing Director may provide certain services to or on behalf of M&P and its wholly owned affiliates, and (b) Managing Director may provide certain services to or on behalf of affiliates of RSM McGladrey. Managing Director shall not be prohibited from engaging in such personal or other nonemployment activities that do not interfere with Managing Director's employment hereunder or violate the other provisions of this Agreement or the H&R Block Code of Business Ethics & Conduct (which Managing Director

acknowledges having read and understood).  Managing Director shall not take personal advantage of any business opportunities that: (i) arise during Managing Director's employment and (ii) may benefit RSM McGladrey.

3.3.    **Policies and Procedures**.  Managing Director will be subject to, and shall at all times comply with, the policies, practices, rules and procedures which are from time to time established by RSM McGladrey or its direct or indirect parent companies for Managing Directors specifically and for employees of RSM McGladrey generally.  Managing Director shall at all times conduct Managing Director's activities hereunder and otherwise in compliance with all applicable laws and rules promulgated thereunder, and with all policies, procedures and standards of any applicable organization, for example, the AICPA.

3.4.    **Charitable and Community Activities**.  It is hereby acknowledged that, Managing Director may either presently, or in the future, be involved in charitable or community activities so long as such other activities do not interfere with the performance by Managing Director of Managing Director's duties hereunder and such involvement is in conformity with all laws applicable to Managing Director and such involvement does not conflict with accounting codes of conduct independence requirements.  Managing Director agrees that Managing Director will not accept a management position or a position on the Board of Directors of any charitable or community organization without first obtaining the approval of RSM McGladrey.

3.5.    **Performance of Professional Responsibility.**  Managing Director shall discharge Managing Director's professional responsibility with integrity, objectivity and due professional care.

4.    **Compensation.**

4.1.    **Amount of Compensation**.  Managing Director's total compensation shall consist of Base Compensation (as defined below) and a possible bonus (currently referred to as the "Annual Performance Bonus"), both in amounts established in accordance with the terms of the RSM McGladrey Managing Director Compensation Plan, as amended or restated from time to time (the "Managing Director Compensation Plan"); provided, however, (a) Base Compensation is subject to adjustment in accordance with the terms of the Managing Director Compensation Plan, as amended from time to time; and (b) to the extent M&P pays any base compensation to Managing Director, such amounts shall reduce the Base Compensation that is payable by RSM McGladrey; and (c) RSM McGladrey shall withhold from any payments  the withholding requirements for federal, state and local income and related taxes and other charges. "Base Compensation" is the amount of compensation awarded to Managing Director each year, excluding any bonus.  Base Compensation will be reviewed for adjustment no less often than annually during the Term and, if adjusted, such adjusted amount shall become the Base Compensation for purposes of this Agreement. Managing Director and RSM McGladrey acknowledge and agree that in addition to employment hereunder, Managing Director may be a Partner or employee of M&P.  The compensation

payable to Managing Director hereunder is deemed to be the fair value for the Services performed by Managing Director on behalf of RSM McGladrey and its customers or clients.

### 4.2. **Adversely Affected Provision**.

(a)    Managing Director has the right to claim to be "Adversely Affected" if at least one of the following conditions is satisfied: (i) Managing Director's Base Compensation from RSM McGladrey is reduced by more than twenty-five percent (25%) from the greatest amount of such actual annual aggregate Adjusted Base Compensation (as defined below) and any Guaranteed Income (as defined below) earned by Managing Director and paid by RSM McGladrey during any of the three 12-month fiscal periods ending immediately prior to such reduction in Base Compensation and such reduction is not the result of a termination for "Cause" as defined in Section 7.1(a) ("Base Compensation Reduction"), or (ii) Managing Director is terminated by RSM McGladrey and such termination is not for "Cause" as defined in Section 7.1(a) ("Termination without Cause"). "Adjusted Base Compensation" shall be Base Compensation in any such year adjusted downward by an amount equal to any reductions in Managing Director's Base Compensation in any subsequent years that have been made as a result of anything other than Managing Director's individual performance. Further details regarding "Adjusted Base Compensation" are set forth in the Managing Director Compensation Plan. "Guaranteed Income" shall be the amount that was awarded to Managing Director, if any, under prior versions of RSM McGladrey employment agreements that was specifically allocated as "Guaranteed Income".

(b)    If Managing Director is Adversely Affected due to a Base Compensation Reduction, then Managing Director shall have no right to elect severance benefits as set forth in Section 4.2(c)(ii) and may elect the following:

To terminate this Agreement and employment with RSM McGladrey and to continue to perform services as an accountant or consultant in competition with RSM McGladrey provided Managing Director (x) pays the applicable amounts set forth in Section 5.2(b), and (y) complies with all applicable provisions hereof (other than Section 5.2(a) to the extent Managing Director is paying the prescribed payments set forth in Section 5.2(b)(i), as modified by this Section 4.2(b), to RSM McGladrey). In such event, the payment terms in Section 5.2(b)(i) shall be modified as follows: (i) the references to "one hundred fifty percent (150%)" shall be changed to "one hundred percent (100%)"; and (ii) the payment of such amount due under Section 5.2(b) may be made in three (3) equal, annual installments with the first installment due within 30 days after RSM McGladrey notifies Managing Director of the amount due ("Initial Due Date") pursuant to this section and subsequent installments are due on the first and second anniversary dates of the Initial Due Date..

(c)     If Managing Director is Adversely Affected due to a Termination without Cause, then Managing Director may elect either of the following:

(i)     To continue to perform services as an accountant or consultant in competition with RSM McGladrey provided Managing Director (x) pays the applicable amounts set forth in Section 5.2(b), and (y) complies with all applicable provisions hereof (other than Sections 5.2(a) to the extent Managing Director is paying the prescribed payments set forth in Section 5.2(b)(i), as modified by this Section 4.2(c)(i), to RSM McGladrey).  In such event, the payment terms in Section 5.2(b)(i) shall be modified to permit payment of such amount due under may be made in three (3) equal, annual installments with the first installment due within 30 days after RSM McGladrey notifies Managing Director of the amount due ("Initial Due Date") pursuant to this section and subsequent installments are due on the first and second anniversary dates of the Initial Due Date..

(ii)    To receive severance benefits in accordance with the terms of the RSM McGladrey Managing Director Severance Plan (the "Severance Plan"), as such plan may be amended from time to time. Notwithstanding any of the terms of the Severance Plan, Managing Director shall forfeit any remaining unpaid payments under the Severance Plan in the event Managing Director violates any of the post-termination obligations contained in this Agreement, including, but not limited, to those obligations set forth in Section 7.4 hereof.

(d)     Managing Director shall lose his right to make any elections permitted by this Section 4.2 unless Managing Director makes written claim to RSM McGladrey, specifying his election to receive the rights under either Sections 4.2(b), 4.2(c)(i) or 4.2(c)(ii), within thirty (30) days after receiving notice of the event which causes him to claim to be Adversely Affected.

4.3.    **Vacation**. RSM McGladrey does not have a traditional vacation policy for managing directors.  Managing Director is expected to accomplish his key objectives and may take off time as necessary.  Time off in excess of three (3) continuous weeks should be mutually agreed to by Managing Director and the RSM McGladrey managing director in charge of Managing Director's assigned office or his designee.

4.4.    **Benefits**.  During the Term, Managing Director shall be eligible to participate in those pension, profit-sharing, stock option, sabbatical or similar plan(s) or program(s) made available to managing directors of RSM McGladrey from time to time, subject to such plans' eligibility requirements and other terms and conditions.  Managing Director shall be entitled to benefits only in accordance with the terms and conditions of such plans as they may be amended from time to time.  Nothing herein shall be construed as requiring RSM McGladrey to establish or continue any particular benefit plan in discharge of its obligations under this Agreement.

5.     **Certain Covenants of Managing Director.**

5.1.     **Certain Acknowledgments.**  Managing Director agrees to and acknowledges the following facts:

(a)     RSM McGladrey and Block have obtained and will maintain an advantage over their respective competitors as a result of name, location, reputation and goodwill developed at great expense.

(b)     Managing Director's relationship with RSM McGladrey involves the creation and understanding of and access to certain trade secrets and confidential and proprietary information pertaining to the property, business and operations of RSM McGladrey, its affiliates, clients and prospective clients.

(c)     Managing Director recognizes the value of the special, unique and extraordinary knowledge and skill required to accept, undertake and perform the type of work normally undertaken and performed by Managing Director, RSM McGladrey and RSM McGladrey's other employees and agents.

(d)     Managing Director's solicitation of certain clients, prospective clients, employees and relationships of RSM McGladrey and/or its affiliates during or following the termination of Managing Director's employment hereunder would impair the operation of RSM McGladrey and/or such affiliates beyond that which would arise from the competition of an unrelated third party with similar skills.

(e)     All clients, and certain prospective clients, regardless of when or by whom acquired, are RSM McGladrey assets and not assets of the individual Managing Director.

(f)     Managing Director has carefully considered the restrictions contained herein, and Managing Director specifically agrees that the same are reasonable, necessary and essential to the preservation of the business of RSM McGladrey, that such restrictions will not unduly restrict Managing Director in earning a livelihood in the event of Managing Director's termination from RSM McGladrey, and that such restrictions shall survive the termination of this Agreement and termination for any reason of Managing Director from RSM McGladrey.

(g)     Managing Director's agreements and covenants under this Article 5 are an essential part of the inducement to RSM McGladrey to enter into this Agreement.

(h)     Considerable time, effort and monies have been expended by RSM McGladrey and its Predecessors (as hereafter defined in this section) over the years to cultivate and acquire the clients RSM McGladrey, and clients and certain prospective clients, among other assets, represents RSM McGladrey's

intangible value. Predecessor(s) shall mean (i) any and all entities, the stock, other ownership interest or the substantial assets of which have been acquired by RSM McGladrey and (ii) any and all entities, the stock, other ownership interest or the substantial assets of which have been acquired by an entity described in Section 5.1(h)(i).

(i)     Managing Director acknowledges and agrees that he owes a duty of loyalty to RSM McGladrey and its Predecessors with which he was associated immediately before joining RSM McGladrey, and that during Managing Director's association with RSM McGladrey and such Predecessor(s), he has abided by, and will continue to abide by, such duty, including but not limited to abiding by the restrictions contained in this Article 5 during his association with RSM McGladrey and for the specified periods thereafter.

5.2.   **Certain Restrictions on Practice and Activities.**  In light of Managing Director's acknowledgment of the facts set forth in Section 5.1 of this Agreement, and in consideration of Managing Director's initial and continued employment by RSM McGladrey, Managing Director hereby agrees to be bound by the following covenants. Managing Director also acknowledges that in the event he should breach any of the covenants contained in this Article 5, any assessment of the damages suffered by RSM McGladrey would be difficult to quantify and would, therefore, likely be inadequate to compensate RSM McGladrey's losses. Therefore, Managing Director hereby agrees that the liquidated damages calculated herein are fair and reasonable estimates of RSM McGladrey's damages in the event of his breach and therefore agrees to be bound by such calculations of his liability for liquidated damages in the event that he breaches such covenants.

(a)     **Solicitation of Protected Clients.**  Managing Director agrees that during the term of this Agreement and upon the termination of the Term for whatever reason, with or without Cause, except as provided in Section 4.2(b) or 4.2(c)(i), Managing Director shall not for himself, or for others, either directly or indirectly, in his individual capacity, or as an employee, independent contractor or agent of another, or in any other capacity whatever for a period of two (2) years after his termination date:

(i)     Solicit or attempt to solicit, divert or attempt to divert, take away or attempt to take away, or accept from any Protected Client (as defined below), any business of a type similar to that provided or planned to be provided by RSM McGladrey to any Protected Client, or

(ii)    Render any services or sell any products to any Protected Client, unless such services or products or similar services or products are not then offered and are not planned to be offered by RSM McGladrey or any of its subsidiaries to such Protected Clients. For purposes of this Article 5, services shall be considered planned to be offered by RSM McGladrey if the following conditions are satisfied:

(i) RSM McGladrey plans to offer such services within six (6) months after Managing Director's termination and (ii) Managing Director participated in RSM McGladrey's or a Predecessor's planning of such services.  Notwithstanding the foregoing, nothing in this Section 5.2(a)(ii) shall prevent Managing Director from performing such services as an employee of a Protected Client, unless such Protected Client's business is to provide services or products similar to those provided by RSM McGladrey or any of its subsidiaries or unless such services are being provided to multiple employers.  For purposes of this Article 5, the term "Protected Client" means:

(x)     Any client, customer or account serviced by an office of RSM McGladrey or a Predecessor to which Managing Director was assigned at any time during the two (2) year period prior to the termination of the Term; or

(y)     Any client, customer or account of RSM McGladrey, or any of its subsidiaries or of a Predecessor that was serviced or counseled by Managing Director at any time during the two (2) year period prior to the termination of the Term; or

(z)     Any client, customer or account serviced by RSM McGladrey or any of its subsidiaries or of a Predecessor who was introduced to Managing Director at any time during the two (2) year period prior to the termination of the Term, or

(xx)    Any client, customer or account about whom Managing Director or Managing Director's supervisees obtained or created Confidential Information (as defined in this Article 5), or

(yy)    Any employee(s) of a Protected Client (as defined in subsections (x)-(xx) above) who selected, or had substantial input in the selection of, RSM McGladrey to provide services to such Protected Client, or

(zz)    Any prospective client, customer, or account that was actively solicited by RSM McGladrey within two years prior to Managing Director's termination, provided Managing Director knew or reasonably should have known of such solicitation prior to Managing Director's termination.

(b)     **Certain Monetary Remedies for Violation of Sections 5.2(a).**

(i)     Liquidated Damages.

(aa)   If Managing Director breached any provisions

or covenants of Section 5.2 (a)(i) or 5.2(a)(ii)(x), (y), (z) or (zz) above, and such breach(es) result(s) in RSM McGladrey's loss of some or all of a Protected Client business to such Managing Director or any person or entity with whom or which the terminated Managing Director becomes employed or associated ("New Organization") then Managing Director shall pay to RSM McGladrey as liquidated damages an amount equal to one hundred fifty percent (150%), without interest, of the dollar amount of Net Services (as hereafter defined) performed by RSM McGladrey or its Predecessors for such Protected Client during the twelve (12) month period ending on the last date RSM McGladrey, its subsidiaries or the Predecessor performed services for such Protected Client.  For purposes of this Agreement, Net Services shall be calculated in accordance with Appendix I and shall be determined on a full accrual basis in accordance with RSM McGladrey's then current method of accounting, but shall exclude and Public Accountancy services performed by M&P.

      (bb)    If Managing Director breaches any term of Section 5(a)(ii)(yy) and/or (zz) and such breach(es) result(s) in such Managing Director or New Organization obtaining business that RSM McGladrey had sought or had a reasonable probability of receiving, then the Managing Director shall pay RSM McGladrey as liquidated damages and not as a penalty fifty percent (50%) of the greater of (x) the fees or compensation received by the terminated Managing Director or any New Organization from such Protected Client during the two year period after Managing Director's termination date, without interest, or (y) the reasonable value of the services provided by the Managing Director or New Organization to the Protected Client during the two (2) year period after Managing Director's termination date, without interest.

      (ii)    Payment of Liquidated Damages.  Managing Director shall promptly notify RSM McGladrey of, and account for, any and all amounts due under this Article 5.  Managing Director shall pay all liquidated damages due pursuant to Section 5.2(b)(i) within thirty (30) days after Managing Director or New Organization is engaged by or starts working for the Protected Client, whichever occurs sooner.  Managing Director shall pay liquidated damages due pursuant to Section 5.2(b)(ii) on a quarterly basis with forty-five (45) days of the end of each calendar quarter.  RSM McGladrey shall have the right and remedy to, from time to time, (x) require Managing Director and/or New Organization to account for, and (y) inspect and audit Managing Director's and/or New Organization's books to determine, the value of all services provided by Managing Director and/or New

Organization to Protected Clients during the two year period immediately following Managing Director's termination from RSM McGladrey.

(c)     **Employment of Protected Personnel.** Managing Director covenants and agrees that during and for the two (2) year period following the termination of the Term (the "Prohibited Period"), for any reason whatsoever, or under any circumstance, with or without Cause, and regardless of by whom, that he shall not solicit, induce or in any manner encourage any other managing director, employee or principal of RSM McGladrey, any of its subsidiaries or M&P (the "Protected Personnel") to terminate his position with RSM McGladrey. Managing Director covenants that he will not during the Prohibited Period offer, or cause to be offered, a position of employment or professional affiliation as a partner, or other equity holder, agent, representative or independent contractor, or in any other capacity, to any member of the class of Protected Personnel who is employed by one of the respective employers identified above on the date on which Managing Director's Term was terminated, or was so employed at any time during the six (6) month period immediately prior to the effective date of such termination.

(d)     **Certain Monetary Remedies for Violation of Section 5.2(c).**

(i)     Liquidated Damages. If Managing Director breaches any term of Section 5.2(c), and such violation results in the loss to RSM McGladrey of the services of one or more person(s) who is (are) considered to be Affected Personnel (as hereafter defined), then Managing Director will pay to RSM McGladrey, as liquidated damages, the greater of (x) Fifty Thousand Dollars ($50,000) or (y) one half of each Affected Personnel's (as hereafter defined) base compensation for the twelve (12) months prior to the termination of Managing Director's employment. For purposes of Sections 5.2(c) and (d), "Affected Personnel" shall mean those members of the Protected Personnel who are induced or encouraged by Managing Director to terminate their employment with RSM McGladrey, any of its subsidiaries or M&P who are offered a position by Managing Director or a New Organization, directly or indirectly, in violation of Section 5.2(c).

(ii)     Payment of Liquidated Damages. Managing Director shall promptly notify RSM McGladrey of, and account for, any and all amounts due under this Article 5. Managing Director shall pay all liquidated damages due pursuant to Section 5.2(d)(i) or (ii) within thirty (30) days after Affected Personnel terminates his (their) employment with RSM McGladrey.

(e)     **Right to Choose Remedy.** Notwithstanding the provisions

of Section 5.2(b), RSM McGladrey shall have the right to pursue actual damages in lieu of liquidated damages and shall have the right to pursue injunction relief to preclude further violations of Section 5.2(a). Managing Director acknowledges that Section 5.2(b) shall not be construed as payment to avoid Managing Director's obligations under Section 5.2(a) or as an alternative performance to the obligations under Section 5.2(a).

(f)     **Right of Offset**. RSM McGladrey shall have the right (but not the obligation) to set off any amount due from such Managing Director against any other amounts or accounts due by RSM McGladrey or Block or its subsidiaries to Managing Director.

(g)     **Prior Agreements**. Managing Director and RSM McGladrey agree that the restrictive covenants contained in this Article 5 shall supersede restrictive covenants between Managing Director and RSM McGladrey, its predecessors or assignors, except that Managing Director and RSM McGladrey agree that, to the extent that this Article 5 is deemed unenforceable for any reason, the prior restrictive covenants between Managing Director and RSM McGladrey, its predecessors or assignors shall remain in full force and effect.

5.3.     **Tolling of Covenant Period**. If Managing Director violates any of the provisions or covenants of Section 5.2 on or after the date on which Managing Director's termination is effective, the term of the applicable restriction period shall be extended for a period of time equal to the period of any such violation.

5.4.     **Duty to Cooperate in Defense of Claims; Indemnification.**

(a)     **Duty to Cooperate**. Managing Director, in consideration of this Agreement and the mutual promises contained herein, shall have a continuing obligation to cooperate with RSM McGladrey both during the term of this Agreement and after his retirement or termination in connection with the defense of any claim involving RSM McGladrey and/or its employees, officers, directors, shareholders, or agents and shall promptly notify RSM McGladrey of any actual or suspected claim. In the event a claim is asserted against RSM McGladrey and/or its employees, officers, directors, shareholders, or agents, Managing Director (whether or not then still employed by RSM McGladrey) shall assist and cooperate with RSM McGladrey in good faith and in such manner as is reasonably possible in developing the information, or providing the statements, documents or testimony reasonably required by RSM McGladrey to properly respond to or defend such claim. RSM McGladrey shall reimburse Managing Director for his reasonable expenses (excluding attorneys' fees except as set forth below) necessary to Managing Director's assistance and cooperation in the defense of such claims, regardless of whether Managing Director is still employed by RSM McGladrey. Managing Director shall take no action at any time to voluntarily assist in the assertion or development of a third party's claim against

RSM McGladrey and/or its employees, officers, directors, shareholders, or agents; provided, however, that nothing herein shall be construed to prevent Managing Director from testifying truthfully and completely at an administrative hearing, a deposition, or in court in response to a lawful subpoenas or as otherwise required by law, in any litigation or proceeding involving RSM McGladrey.

(b)    **Indemnification**. RSM McGladrey shall indemnify Managing Director in connection with third party claims by reason of the former or present official capacity of Managing Director against judgments, penalties, fines, including, without limitation, excise taxes assessed against Managing Director with respect to an employee benefit plan, settlements, and reasonable expenses, including attorneys' fees and disbursements, incurred by Managing Director in connection with such claims, provided that Managing Director (1) has provided RSM McGladrey with notice of the claim within thirty days after Managing Director has first notice of the claim; (2) has not been indemnified by another organization or employee benefit plan for the same judgments, penalties, fines, including, without limitation, excise taxes assessed against Managing Director with respect to an employee benefit plan, settlements, and reasonable expenses, including attorneys' fees and disbursements, incurred by Managing Director in connection with the proceeding with respect to the same acts or omissions; (3) acted in good faith; (4) received no improper personal benefit; (5) in the case of a criminal proceeding, had no reasonable cause to believe the conduct was unlawful; and (6) reasonably believed that the conduct was in the best interests of the corporation. If Managing Director is made or threatened to be made a party to a third party claim, Managing Director shall be entitled, upon written request to RSM McGladrey, to payment or reimbursement by RSM McGladrey of reasonable expenses, including attorneys' fees and disbursements, incurred by Managing Director in advance of the final disposition of the proceeding, (a) upon receipt by RSM McGladrey of a written affirmation by Managing Director of a good faith belief that the criteria for indemnification set forth herein have been satisfied and a written undertaking by Managing Director to repay all amounts so paid or reimbursed by RSM McGladrey, if it is ultimately determined that the criteria for indemnification have not been satisfied, and (b) after a determination that the facts then known to those making the determination would not preclude indemnification under this provision.

5.5.    **Nondisclosure**. Managing Director shall not at any time or in any manner, directly or indirectly, during or after the Term, use or disclose to any party other than RSM McGladrey any trade secrets or other Confidential Information (defined herein) learned or obtained by Managing Director while an employee of RSM McGladrey. As used herein, the term "Confidential Information" includes information disclosed to or known or created by Managing Director (whether before or after the date of this Agreement) as a consequence of Managing Director's position with RSM McGladrey or any of its subsidiaries or a Predecessor and not generally known in the industry in which RSM McGladrey is engaged and that in any way relates to the products, processes,

services, inventions (whether patentable or not), formulas, techniques or know-how, including, but not limited to, information relating to distribution systems and methods, research, development, manufacturing, purchasing, accounting, procedures, engineering, marketing, customers, vendors, merchandising and selling, of RSM McGladrey or any of its subsidiaries, and regardless of the format in which it is presented or embodied (written, oral, graphic, electromagnetic or otherwise). The term "Confidential Information," as used herein, shall also include information regarding the clients of any person or entity for which RSM McGladrey or any of its subsidiaries provides services. The term "Confidential Information," as used herein, does not include information: (a) which was already in the public domain through authorized disclosures by RSM McGladrey or any of its subsidiaries or its affiliates or (b) which is disclosed as a matter of right by a third party source after the execution of this Agreement provided such third party source is not bound by confidentiality obligations in favor of RSM McGladrey or any of its subsidiaries or a Predecessor.

     5.6.   **Inventions**. Managing Director agrees that all inventions, discoveries, written materials, brochures, training programs, training materials, programs, seminars, estate planning products, financial planning products and asset management products conceived of or developed by Managing Director during the Term, whether alone or jointly with others, whether during working hours or otherwise, regardless of whether they are patentable or copyrightable, which relate to the business of RSM McGladrey or any of its subsidiaries or any affiliate of RSM McGladrey are "works made for hire" and agrees to, and hereby does, assign them to RSM McGladrey. Managing Director shall: (i) promptly disclose in writing to RSM McGladrey each invention, written material, brochure, training program, training material, program, seminar, estate planning product, financial planning product or asset management product conceived by or developed by Managing Director during the term of his employment with RSM McGladrey or any of its subsidiaries and (ii) assist RSM McGladrey in every way to obtain and protect any patents, trademarks, copyrights or service marks on the same. Managing Director is hereby notified that the above agreement to assign inventions to RSM McGladrey does not apply to any invention for which no equipment, supplies, facility, or Confidential Information of RSM McGladrey was used, which was developed entirely on Managing Director's own time, and (a) which does not relate: (i) directly to RSM McGladrey's business; or (ii) to RSM McGladrey's actual or demonstrably anticipated research or development; or (b) which does not result from any work performed by Managing Director for RSM McGladrey.

     5.7.   **Copyrights**. Managing Director agrees that any articles, computer software, or internet applications or other work of authorship (hereinafter referred to as "Works") prepared by Managing Director for the benefit of, or for distribution, use by, or publication to, RSM McGladrey or its clients, or prepared at the request of RSM McGladrey or its clients (as well as Managing Director's contributions to any other Works relating to RSM McGladrey), shall be considered "work made for hire" under U.S. Copyright law and that all such Works shall belong to RSM McGladrey. To the extent that such Works cannot be considered a "work for hire," Managing Director agrees to disclose and hereby assigns to RSM McGladrey all right, title, and interest in and to such

Works, and agrees to assist RSM McGladrey y executing any such documents or applications as may be useful to evidence, register, or perfect such ownership of such Works. To the extent such Works are based on preexisting work in which Managing Director has an ownership interest, Managing Director grant RSM McGladrey all right, title, and interest in such Works free and clear of any claim based on the preexisting work.

    5.7.   **Limitations on Enforcement**. If any restriction set forth in this Section 5 is found by any tribunal of competent jurisdiction to be unenforceable, invalid or overbroad, it is the intention of Managing Director and RSM McGladrey that the tribunal modify such restriction to make it enforceable to the maximum extent allowable under the law. If the restriction cannot be so modified, then the tribunal shall sever such restriction and the other parts of this Agreement shall remain enforceable. It is further the intention of Managing Director and RSM McGladrey that, if any restriction in this Article 5 is found by any tribunal of competent jurisdiction to be lacking consideration, then Managing Director shall be bound by, and the tribunal shall enforce, such comparable restriction contained in the most recent prior Employment Agreement that was supported by adequate consideration and executed by Managing Director and RSM McGladrey.

    6.    **Certain Remedies**.

    6.1.   **Specific Performance**. If Managing Director shall at any time threaten to or breach, violate or fail to comply fully with any of the terms, provisions or conditions of this Agreement, the parties intend that RSM McGladrey shall be entitled to seek equitable relief against Managing Director by way of injunction without having to first file a mediation or arbitration. RSM McGladrey's receipt of an injunction against Managing Director shall not impair its ability to seek legal relief for damages arising out of Managing Director's breaches of Sections 5.2(a) or (c) prior to the date the injunction was granted. Damages and rights of offset pursuant to Section 5.2(b), (d) and (e) shall be in addition to, and not in lieu of, any other remedy of RSM McGladrey.

    6.2.   **No Proof of Irreparable Injury; Presumption; Waiver.** In any proceeding, whether in equity, at law or in arbitration, Managing Director specifically waives any requirement that RSM McGladrey prove that any threatened or actual breach, violation or failure to comply fully with the terms, provisions or conditions of this Agreement will cause irreparable injury or that there is no adequate remedy at law. In the event Managing Director serves as an employee, independent contractor, agent or in any other capacity for any other firm within the two-year period following termination of employment for any reason and such firm provides any services or sells any product to any Direct Client (as defined below) if such services or products are then offered by or planned to be offered by RSM McGladrey, Managing Director agrees that there shall be a presumption that Managing Director is responsible for such firm's activities in violation of this Agreement. Such presumption shall apply for purposes of RSM McGladrey obtaining injunctive or any other equitable relief. "Direct Client" means any client, customer or account of RSM McGladrey, or any of its subsidiaries or of a Predecessor that was serviced or counseled by Managing Director at any time during the two (2) year

period prior to the termination of the Term. Managing Director also agrees not to raise as a defense in any such proceeding any allegation: (i) that any of the provisions of Sections 5 and/or 6 are either unnecessary, unreasonable or unenforceable, that any of them illegally restrain trade, competition or any personal rights of Managing Director, or (ii) that payments made by RSM McGladrey subsequent to gaining knowledge of a violation of this Agreement prejudices RSM McGladrey's rights to enforce the Agreement or recover payments made, or (iii) that the non-enforcement of RSM McGladrey's rights to enforce the Agreement or recover payments made or that the non-enforcement of RSM McGladrey's rights with regard to one Managing Director or one act prejudices RSM McGladrey's rights and remedies under this Agreement, all of which are in addition to all rights and remedies to which RSM McGladrey is or shall be otherwise entitled at law or in equity.  RSM McGladrey shall not be required to post bond in any proceeding to enforce the provisions of Section 5 and/or 6 hereof.

      6.3    **Recovery of Costs**.  The parties acknowledge and agree that, if Managing Director breaches or threatens to breach the provisions of Article 5, RSM McGladrey shall be entitled as a matter of right to recover from Managing Director the costs incurred by RSM McGladrey in enforcing the terms of Article 5, including but not limited to recovering its reasonable attorneys' fees, costs, and expenses, in addition to any other remedies available at law or equity.

    7.    **Termination**.

      7.1.    **Methods of Termination**.  This Agreement and the employment of Managing Director hereunder may be terminated as follows:

      (a)    By RSM McGladrey immediately for "Cause," upon the delivery of written notice thereof to Managing Director.  For purposes of this Agreement, "Cause" shall mean the occurrence of any one of the following on the part of Managing Director:

      (i)    Managing Director's conviction or a plea of guilty or *nolo contendere* to a crime involving moral turpitude or a crime providing for a term of imprisonment; or

      (ii)    Managing Director's engagement in willful misconduct (including but not limited to Managing Director's discrimination or harassment or unethical or unprofessional conduct) injurious to RSM McGladrey, its affiliates or any of their respective reputations; or

      (iii)    Managing Director's breach of Managing Director's fiduciary duty to RSM McGladrey; or

      (iv)    Managing Director's engagement in activities which constitute a material breach of this Agreement or any other

material agreement or contract between Managing Director and RSM McGladrey; or

(v)  Managing Director's gross negligence in the execution of, or Managing Director's willful failure to carry out, his duties and responsibilities up to the standards of performance, which could reasonably be expected from a Managing Director in his position; or

(vi)  Managing Director's act or acts of fraud, embezzlement or dishonesty either (a) taken by Managing Director to the detriment of RSM McGladrey or (b) by others in conspiracy or affiliation with Managing Director and intended to result in enrichment or advantage to Managing Director at the expense of RSM McGladrey or with use of RSM McGladrey's assets or information; or

(vii)  Managing Director's intentional grossly negligent or repeated lack of adherence to the Rules of Conduct contained in the Code of Professional Ethics of the AICPA, as amended from time to time; or

(viii)  Managing Director's material violations of RSM McGladrey's policies or procedures, including, but not limited to, the H&R Block Code of Business Ethics & Conduct, except those policies or procedures with respect to which an exception has been granted under authority exercised or delegated by RSM McGladrey; or

(ix)  Managing Director's failure to pay and file on a timely basis, including extensions, complete and accurate Federal and state tax returns; or

(x)  Managing Director's failure to transition clients to others within RSM McGladrey in the event Managing Director's relationship with RSM McGladrey is ceasing for any reason, except with respect to those clients for whom Managing Director has made a timely election to make payments pursuant to Section 4.2 (b) or 4.2(c)(i); or

(xi)  Managing Director's failure to successfully pass a background check as may be required by RSM McGladrey or its Clients. RSM McGladrey has sole discretion to determine what constitutes a successful background check; or

(xii)    Managing Director's failure to sign an employment agreement approved by RSM McGladrey; or

(xiii)   Other gross misconduct which is detrimental to the best interests of RSM McGladrey.

To prevent the inadvertent loss of rights as a result of the first occurrence of actions deemed to fall under (i) through (xiii) above, the offending Managing Director shall have the right (within thirty (30) days after receipt of a written termination notice) to seek reconsideration of any such termination by the RSM McGladrey Compensation Committee or if such committee does not then exist, any other RSM McGladrey committee that considers RSM McGladrey's compensation issues or general policies; provided, however, such reconsideration may occur after the effective date of such termination.

(b)    By RSM McGladrey without "Cause" upon written notice to Managing Director.

(c)    By Managing Director on sixty (60) days' written notice to RSM McGladrey (which notice period may be accelerated at RSM McGladrey's discretion).

(d)    Upon the death or Disability (defined herein) of Managing Director. For purposes of this Agreement, "Disability" means the substantial inability of a Managing Director to perform all of such Managing Director's duties or services as provided in this Agreement because of mental, physical or other illness, disease or injury, where such disability either (a) shall have existed for an aggregate of six (6) months in any twelve (12) month period, (b) has prevented Managing Director from performing substantially all of his duties under this Agreement for a period of six (6) consecutive months, or (c) has been agreed to by Managing Director and RSM McGladrey as constituting a disability preventing Managing Director from substantially performing his duties hereunder. Managing Director shall continue to receive his Base Compensation for the six (6) months prior to a termination due to Disability. This Section 7.1(d) is not intended to conflict with the provisions of the Americans With Disabilities Act ("ADA"), and to the extent that the ADA provides additional rights to Managing Director, such rights are hereby incorporated.

(e)    By Managing Director upon sixty (60) days written notice or such other notice that is mutually agreed upon if Managing Director elects to retire after attaining the eligible retirement age as established by RSM McGladrey from time to time.

(f)    By express mutual written agreement signed by Managing Director and RSM McGladrey.

7.2.   **Payments Upon Termination**.  Upon termination, any amount due RSM McGladrey or Managing Director under this Agreement shall be paid to RSM McGladrey or Managing Director or Managing Director's representative (as may be the case in the event of death or disability), as set forth below:

(a)   If this Agreement is terminated pursuant to Section 7.1(a) or by Managing Director pursuant to Section 4.2(b), 4.2(c)(i) or Section 7.1(c), RSM McGladrey shall pay to Managing Director, if not already paid, any Base Compensation payable through the date of such termination.  Managing Director shall not be eligible or entitled to receive any other compensation, whether bonus or other form thereof, for the fiscal year in which such termination occurred, to the extent not theretofore paid, unless such termination is effective on the last day of the fiscal year.  In the event Managing Director has earned a bonus for the prior fiscal year and has been terminated prior to the date such bonus is payable, RSM McGladrey shall pay to Managing Director such bonus on the date such bonus would otherwise be payable.

(b)   If this Agreement is terminated by RSM McGladrey without "Cause" pursuant to Section 7.1(b) or because of the death or Disability of Managing Director pursuant to Section 7.1(d) or by Managing Director pursuant to Section 7.1(e), RSM McGladrey shall pay to Managing Director, if not already paid, (i) any Base Compensation payable through the date of such termination plus (ii) if the termination is pursuant to Section 7.1(b), the bonus for the fiscal year in which such termination occurred, but only if such termination is effective on the last day of RSM McGladrey's fiscal year plus  (iii) if the termination is pursuant to Section 7.1(d) or 7.1(e), the portion of any bonus for the fiscal year in which such termination occurred that is approved by RSM McGladrey plus (iv) if the termination is pursuant to Section 7.1(b), the remuneration provided for in Section 4.2(c)(ii) (on the dates provided in that Section, and only if the Manager Director elects the severance benefits  provided in Section 4.2(c)(ii)) plus (v) any bonus which the Managing Director has earned in the prior fiscal year if he has been terminated prior to the date such bonus is payable (any such bonus would be due on the date such bonus would otherwise be payable).

(c)   If this Agreement is terminated by mutual agreement of Managing Director and RSM McGladrey, RSM McGladrey shall pay to Managing Director such payments, if any, as may be so agreed.

(d)   Except as otherwise provided herein, no other consideration of any type will be due and owing to Managing Director by RSM McGladrey upon any termination of this Agreement.

7.3.   **Release of Claims**.  Notwithstanding the foregoing, RSM McGladrey shall not be obligated to pay Managing Director any of the payments referred to in Section 7.2(b) or Section 7.2(c), with the exception of any Base Compensation

earned prior to termination, unless and until RSM McGladrey has received a release of claims executed by Managing Director in a form satisfactory to RSM McGladrey in its reasonable discretion.

7.4.   **Effect of Termination**.  Upon any termination of Managing Director's employment pursuant to Section 7.1 hereof, RSM McGladrey and Managing Director shall have no further obligations under this Agreement to the other except (i) Managing Director's obligations under the provisions of Section 5.2 which shall continue in full force and effect for the terms specified in such Section, (ii) Managing Director's obligations under and the provisions of the remainder of Articles 5, 6, 7 and 8 which shall continue in full force and effect indefinitely, (iii) RSM McGladrey's obligations under the provisions of Articles 4 and 7 which shall continue in full force and effect and (iv) Managing Director's obligation to effect a smooth transition of the clients to other personnel with RSM McGladrey.

7.5.   **Post-Employment Obligations**.  All records, files, lists, including computer generated lists, drawings, documents, equipment and similar items relating to RSM McGladrey's business that Managing Director shall prepare or receive from RSM McGladrey shall remain RSM McGladrey's sole and exclusive property.  Upon termination of this Agreement, Managing Director shall return to RSM McGladrey all property of RSM McGladrey in his possession.  Managing Director further represents that Managing Director will not copy or cause to be copied, or print out, or cause to be printed out any software, documents or other materials originating with or belonging to RSM McGladrey.  Upon termination of Managing Director's employment hereunder, Managing Director agrees that (a) he will not retain in Managing Director's possession any such software, documents or other materials and (b) he will take all reasonable steps necessary to effect a smooth transition of clients and ongoing work to others with RSM McGladrey as RSM McGladrey may request.

8.   **Miscellaneous**.

8.1.   **Entire Agreement**.  This Agreement constitutes the entire agreement and understanding between RSM McGladrey and Managing Director concerning the subject matter hereof. RSM McGladrey's failure to insist upon strict compliance with any of the terms, covenants or conditions hereof shall not be deemed a waiver of such terms, covenants and conditions.

8.2.   **Successors and Assigns**.  This Agreement shall be binding upon Managing Director and the heirs, executors and administrators of Managing Director or Managing Director's estate and property, and shall inure to the benefit of RSM McGladrey and its successors and assigns.  Being a contract for personal services, Managing Director may not assign or transfer to others (a) the right to receive payments hereunder, or (b) the obligation to perform Managing Director's duties and services hereunder.  RSM McGladrey may assign this Agreement to any person or entity on notice to Managing Director.

8.3.   **Notices.**  Any notice, request, consent or communication (collectively, a "Notice") under this Agreement shall be effective only if it is in writing and (a) personally delivered, (b) sent by certified or registered mail, return receipt requested, postage prepaid, (c) sent by a nationally recognized overnight delivery service, with delivery confirmed, or (d) faxed or telecopied, with receipt confirmed, addressed as follows:

If to Managing Director, to such address as Managing Director has or shall furnish to RSM McGladrey in writing. In the event Managing Director has not furnished such an address to RSM McGladrey, such address shall be deemed to be Managing Director's address that he has on file with RSM McGladrey.

If to RSM McGladrey:

President
RSM McGladrey, Inc.
3600 American Blvd. W., 3rd Floor
Bloomington, Minnesota 55431

with a copy to:

RSM McGladrey, Inc.
Attn:  General Counsel's Office.
3600 American Blvd. W., 3rd Floor
Bloomington, Minnesota 55431

8.4.   **Gender**.  Whenever used in this Agreement, any pronoun shall be deemed to cover and have reference to all genders and to be both singular and plural, as applicable.

8.5.   **Arbitration.**

(a)   Any controversy, claim, or dispute arising out of or relating to this Agreement or any breach thereof, including without limitation any dispute concerning the scope of the arbitration clause set forth below, shall be resolved as set forth below.  Notwithstanding the foregoing, claims for alleged violations of Sections 3.1, 3.2, 5.2, 5.4, 5.5, 5.6, 7.4, 7.5 and/or any claims pursuant to Sections 6.1 or 6.2 may be brought immediately in court, without having to first file a mediation or arbitration, for the purpose of obtaining preliminary injunctive relief (e.g. temporary restraining orders and/or preliminary injunctions) pending the outcome of the dispute resolution procedures described in this Article 8, and any permanent equitable relief awarded in conjunction therewith. With respect to alleged violations of other sections of this Agreement not specifically mentioned in the prior sentence, a party may not seek injunctive relief in a court of competent jurisdiction until the prescribed mediation and arbitration set forth in this Agreement has been concluded, but the arbitrators may award such relief.

(b)       In the event a dispute arises relating to this Agreement, any party may demand mediation by notifying the American Arbitration Association ("AAA") in the location where any arbitration would be conducted as set forth below, in writing with copies to all other parties involved in the dispute. The notification will state with specificity the nature of the dispute and the amount of any claims. Upon receipt of the mediation demand, the AAA will immediately convene a pre-mediation telephone conference of the parties hereto. The parties will make a representative, with full authority to settle, available for such a conference within five (5) business days of being contacted by the AAA or its designated mediator ("Mediator"). During the pre-mediation telephone conference, the parties will agree on mediation procedures or, in the event they cannot agree, the Mediator will set the mediation procedures. The mediation procedures will provide for the mediation to be completed within thirty (30) business days of the date of the initial demand for mediation. The parties will participate in good faith in the mediation and will use their best efforts to reach a resolution within the thirty (30) day time period. Each party will make available in a timely fashion a representative with authority to resolve the dispute. In the event that the dispute has not been resolved within thirty (30) days, the mediation may continue if the parties so desire. If not, the Mediator will so notify the parties and declare the mediation terminated. In the event that the mediation continues beyond thirty (30) days, but is not resolved within what the Mediator believes is a reasonable time thereafter, the Mediator will so notify the parties, and declare the mediation terminated. Fees of the mediator shall be split equally between the parties.

(c)       After the mediation has been declared terminated, the matters in dispute shall be settled by binding arbitration in accordance with the Commercial Arbitration Rules (the "Rules") of the AAA as supplemented herein and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof. The governing law of this Agreement shall be the law used by the arbitrators in rendering their award, except that the Federal Rules of Evidence shall apply. There shall be three arbitrators. Each party shall choose one arbitrator, and the two chosen arbitrators shall choose the third arbitrator. Pending final award, the arbitrators' compensation and expenses shall be advanced equally by the parties. The AAA shall hold an administrative conference with counsel for the parties within twenty (20) days after the filing of the demand for arbitration by any one or more of the parties. The parties and the AAA shall thereafter cooperate in order to complete the appointment of three arbitrators as quickly as possible. Within fifteen (15) days after all three arbitrators have been appointed, an initial meeting (which, if the arbitrators so determine, may be by phone) among the arbitrators and counsel for the parties shall be held for the purpose of establishing a plan for administration of the arbitration, including: (1) definition of issues; (2) scope, timing, and types of discovery, which may at the discretion of the arbitrators include production of documents in the possession of the parties, but may not without consent of all

parties include depositions; (3) exchange of documents and filing of detailed statements of claims, prehearing memoranda and dispositive motions; (4) schedule and place of hearings; and (5) any other matters that may promote the efficient, expeditious, and cost-effective conduct of the proceeding. Each party shall have the right to request the arbitrator to make specific findings of fact.

(d)   The majority decision of the arbitrators shall contain findings of facts on which the decision is based, including any specific factual findings requested by either party, and shall further contain the reasons for the decision with reference to the legal principles on which the arbitrators relied. Such decision of the arbitrators shall be final and binding upon the parties. The arbitration shall take place in Minneapolis, Minnesota. In the event the arbitrators find that one of the parties has breached this Agreement, the breaching party shall pay the nonbreaching party's attorneys' fees and costs incurred in connection with the arbitration.

8.6.   **Right to Offset**. RSM McGladrey, for itself and as a subsidiary of Block, shall have the right but not the obligation to offset against amounts due Managing Director hereunder any amounts due RSM McGladrey by Managing Director which are not paid to RSM McGladrey by Managing Director within ten (10) days following demand, regardless of the source of such obligation from Managing Director to RSM McGladrey.

8.7.   **Waiver of Jury Trial**. Notwithstanding anything to the contrary herein, if at any time there is a matter pending in a court of competent jurisdiction regarding any matter directly or indirectly related to this Agreement and/or Managing Director's employment hereunder, the parties hereto waive any and all right to any trial by jury.

8.8.   **Governing Law**. This Agreement shall be governed by the laws of the State of Minnesota, without giving effect to its, or any other state's, choice of law provisions.

8.9.   **Forum Selection**. The parties agree that any legal proceedings between the parties arising under, arising out of, or relating to the relationship created by this Agreement, including arbitration proceedings discussed above, shall be filed and/or maintained in Minneapolis, Minnesota or within the applicable judicial district that includes Minneapolis, Minnesota. Managing Director hereby agrees to waive the defense of personal jurisdiction to any matter maintained in the State of Minnesota.

8.10.   **Headings**. All headings in this Agreement are for convenience only and are not intended to affect the meaning of any provision hereof.

8.11.   **Counterparts & Electronic Signature**. This Agreement may be executed in two or more counterparts with the same effect as if the signatures to all such counterparts were upon the same instrument, and all such counterparts shall constitute but

one instrument.  Managing Director consents to the use of electronic signatures by RSM McGladrey and agrees that the use thereof will not affect the validity or enforceability of this Agreement or any addenda hereto.

        8.12.  **Amendment**.  This Agreement cannot be added to, altered, changed, modified or amended in any respect except by a writing duly executed by the parties hereto.  Where an amendment is agreed to by the parties hereto, the box indicating that an addendum is attached to this Agreement must be checked on the signature page of this Agreement and the addendum must be attached to this Agreement.

        **[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK; SIGNATURE PAGE TO FOLLOW.]**

PLEASE NOTE:  BY SIGNING THIS AGREEMENT, MANAGING DIRECTOR IS HEREBY CERTIFYING THAT HE (A) RECEIVED A COPY OF THIS AGREEMENT FOR REVIEW AND STUDY BEFORE EXECUTING IT; (B) READ THIS AGREEMENT CAREFULLY BEFORE SIGNING IT; (C) HAD SUFFICIENT OPPORTUNITY BEFORE SIGNING THIS AGREEMENT TO CONSULT HIS ATTORNEY TO ASK ANY QUESTIONS ABOUT THIS AGREEMENT AND TO BE ADVISED OF THE LEGAL RAMIFICATIONS OF THIS AGREEMENT; AND (D) UNDERSTANDS HIS RIGHTS AND OBLIGATIONS UNDER THIS AGREEMENT.

**IN WITNESS WHEREOF**, Managing Director has executed this Agreement and RSM McGladrey has caused this Agreement to be executed by its duly authorized officer to be effective as of the Effective Date.

**RSM McGLADREY, INC.**

Kimpa A. Moss

Kimpa Moss

Title:   Chief HR Officer

Date:   _____, 200__

**MANAGING DIRECTOR**

By:   _____

Name:   Steven Schwartz

Date:   10/1/2008

Indicate if any approved addenda to this Agreement are attached:

☐  Other: _____

☐  Other: _____

MDEA CPA
Version 09.06

**APPENDIX I**

## Calculation of Net Client Services

Net Client Services is calculated on the following formula

**Personnel Revenue**

| | | |
|---|---|---|
| Services to Location Clients | | xxxxxx |
| Plus/minus Overages/Shortages | + / - | xxxxxx |
| Plus/minus WIP Reserve Adjustments | + / - | xxxxxx |
| Total Personnel Revenue | | xxxxxx |

**Non Personnel Revenue**

| | | |
|---|---|---|
| Other Income | | xxxxxx |
| Expense Allocated to clients, net of cost | + / - | xxxxxx |
| Total Non Personnel Revenue | | xxxxxx |
| Net Client Services | | XXXXXXX |

1. Services to Location Clients is defined as the sum of revenue from each employee or subcontractor, calculated by multiplying chargeable hours by an hourly rate.

2. Overages and Shortages are defined as billing adjustments taken on clients which is calculated as the difference between actual gross services and the amount actually billed to the client.

3. WIP Reserve Adjustments are defined as a provision for estimated billing adjustments. These are defined at the end of every month by billers.

4. Other Income is defined as revenue non-hourly revenues such as Wealth Management Advisory Fees and Sale of Computer Hardware or Software, if applicable.

5. Expenses Allocated to Clients are defined as any expense incurred by RSM that is charged to a client. These may include actual expenses, (i.e. delivery services) as well as allocated amounts charged to clients (i.e. tax preparation charges, standard charges for sporting event tickets, etc.); provided however, that any expenses that have been included in the determination of the Purchase Price shall not be included to reduce the determination of the amount of Net Client Services.